I. J. and ILENE J. WAGNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wagner v. Commissioner
Docket No. 2217-72
United States Tax Court
T.C. Memo 1974-42; 1974 Tax Ct. Memo LEXIS 278; 33 T.C.M. (CCH) 201; T.C.M. (RIA) 74042; February 19, 1974, Filed. J. Jay Bullock, for the petitioners Craig D. Platz, for the respondent FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1969 and 1970 in the respective amounts of $7,800.64 and $3,444.20. The only issues remaining for disposition by this Court pertain to whether petitioners are properly entitled to depreciation deductions for the years in issue with respect to depreciable property acquired in June 1969 by a partnership in which petitioner I. J. Wagner was a partner. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. *279 Petitioners, I. J. Wagner and Ilene J. Wagner, are husband and wife who resided in Salt Lake City, Utah, at the time their petition herein was filed. Petitioners timely filed their joint Federal income tax returns for the years in issue with the Internal Revenue Service Center at Ogden, Utah. Ilene J. Wagner is a petitioner in the instant case solely by having filed a joint Federal income tax return for 1969 and 1970 with her husband; accordingly, all references hereinafter to petitioner are to I. J. Wagner. On September 15, 1968, National City Lines, Inc. (National City), which owned improved real property located in Salt Lake City, Utah (hereinafter designated as the Trolley Square property), leased the Trolley Square property to Salt Lake City Lines for a stated term from August 31, 1968, to August 31, 1970.
Upon learning during the early part of 1969 that the Trolley Square property could be purchased for $675,000, petitioner and C. Taylor Burton (Burton) offered on April 15, 1969, to purchase the Trolley Square property from National City for $600,000. Subsequent to considerable negotiations, petitioner and Burton contracted on June 26, 1969, to purchase the Trolley Square *280 property from National City for $610,000 (the real estate contract). The real estate contract contained the following pertinent provisions: (1) petitioner and Burton agreed that National City would be entitled to retain all monthly rental payments from the Salt Lake City Lines lease during the period from June 26, 1969, through August 31, 1970; (2) National City agreed that it would be responsible for all real estate property taxes and insurance premiums with respect to the Trolley Square property; (3) petitioner and his co-purchasers were not entitled to possession of the Trolley Square property until the expiration or earlier termination of the Salt Lake City Lines lease; (4) petitioner and his co-purchasers were not obligated to commence payments of interest on the balance of the purchase price for the Trolley Square property until the Trolley Square property had been vacated by the Salt Lake City Lines; [1] and (5) petitioner and his co-purchasers agreed to accept delivery of the Trolley Square property in the condition the property was in as of June 26, 1969, subsequent normal wear and tear excepted. *281 Concurrently with the execution of the real estate contract, Donald P. Lloyd (Lloyd) purchased from petitioner and Burton on June 26, 1969, an undivided one-third interest in the real estate contract. On November 24, 1969, National City executed a warranty deed covering the Trolley Square property to petitioner and Burton. Subsequent to its execution, the warranty deed has been held in escrow contingent upon payment of the purchase price by petitioner and his co-purchasers. On January 22, 1970, Wallace A. Wright, Jr. (Wright), purchased Burton's one-third interest in the real estate contract. On February 1, 1970, petitioner, Lloyd and Wright formally established a partnership (the Trolley Square partnership) for the express purpose of acquiring, developing and operating real estate. Pursuant to the Trolley Square partnership agreement, the partners contributed their respective interests in the Trolley Square property to the capital of the Trolley Square partnership. Although National City assigned to petitioner and Wright all of its interest in the Salt Lake City Lines lease on October 19, 1969, petitioner as a matter of practice continued until August 31, 1970, to request *282 the permission of both National City and Salt Lake City Lines to remodel, repair and/or improve the Trolley Square property. Prior to expiration of the Salt Lake City Lines lease, the Trolley Square partnership and the Utah Transit Authority (the successor in interest to Salt Lake City Lines) negotiated unsuccessfully with respect to continued leasing of the Trolley Square property after August 31, 1970, by the Utah Transit Authority. Although the Utah Transit Authority did continue to occupy the Trolley Square property for approximately one additional month after its lease had expired, the unsuccessful lease renewal negotiations resulted in the Utah Transit Authority's vacation of the Trolley Square property premises before or on September 30, 1970. On November 2, 1970, the Trolley Square partnership leased a portion of the Trolley Square property for usage as a gas and service station. The service station lease was scheduled to commence either as of January 1, 1971, or as of the date that the service station actually commenced operations. The Trolley Square gas station commenced business on May 1, 1971. Petitioner envisioned at the inception of the 1969 negotiations for *283 acquiring the Trolley Square property that the Trolley Square property had a wide range of economic potential - e.g., it was conceived of as being appropriate for a cash and carry grocery operation, a warehouse furniture outlet, a storage facility for downtown Salt Lake City merchants, a drug store, and/or a shopping center. The Trolley Square partnership reached a firm decision sometime during September 1971 to convert the Trolley Square property into a shopping center. Aside from the rental income produced by the Utah Transit Authority's occupancy of the Trolley Square property from August 31, 1970, to approximately September 30, 1970, the Trolley Square property produced no other rental income during the period from September 1, 1970, through December 31, 1970. The Trolley Square property was extensively remodeled and repaired during 1970. The Trolley Square partnership was not in the trade or business of buying and selling property, and the Trolley Square property was never held by the Trolley Square partnership for the production of income from the sale of such property. Respondent in his notice of deficiency dated March 3, 1972, disallowed the depreciation deductions *284 claimed by petitioners for the years in issue. [2]
ULTIMATE FINDING OF FACT The Trolley Square partnership held the Trolley Square property for the production of income from September 1, 1970, through December 31, 1970. OPINION The first issue involves the question of whether petitioner was properly entitled to a depreciation deduction with respect to the Trolley Square property for the period from June 26, 1969, through August 31, 1970. Petitioner argues that he had a depreciable economic interest in the Trolley Square property during the period of time in issue, and that he was, therefore, entitled to a depreciation deduction for this time period. Respondent contends that even if petitioner and his co-purchasers effectively acquired legal title to the Trolley Square property as of June 26, 1969, they, in effect, bargained away their rights to a depreciation deduction with respect to the Trolley Square property for the June 26, 1969, through August 31, 1970 time period, and, thus, petitioner was not properly entitled *285 to the depreciation deduction in issue for the time period in question. We agree with respondent. Petitioner has the burden of proving that respondent's disallowance of the claimed depreciation deduction during the June 26, 1969, through August 31, 1970 time period was erroneous. See Welch v. Helvering, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. After closely reviewing the record in the instant case, we are persuaded that petitioner has failed to carry his burden with respect to the first issue. In Fox River Paper Co., 28 B.T.A. 1184 (1933), the Board of Tax Appeals was confronted with an analogous issue to that in the instant case. The following excerpted language from the Fox River Paper Co. decision is relevant to the disposition of the instant issue: To retain the use and possession of the property was of substantial value to the seller, and, since the petitioner was desirous of obtaining the use and possession thereof as soon as possible, the delay therein would be a disadvantage to it in that it was unable to prepare and use the property for its own purposes as rapidly and as soon as it would have been able *286 to do had it secured the immediate delivery of the property. Certainly all of these factors entered into the determination by the parties of the consideration to be paid for the property by the petitioner. It would be unreasonable to say that the seller, in view of the condition of its business at the time and its need for the utmost capacity of all its facilities, would have fixed the same price for the property as stated in the contract of June 8, 1920, had it been required to deliver the property on June 8, 1920, or shortly thereafter. It would not be reasonable to say that the petitioner would have agreed to pay the same purchase price for the property inrrespective of the time of delivery and use thereof by some one other than itself. The officers of both the seller and the petitioner, who negotiated this deal and who acted on behalf of their respective corporations, were men of wide business experience. They certainly would know and realize that the value of the property was greater on June 8, 1920, than on January 1, 1921, to the extent of the depreciation caused by the use thereof by the seller and lapse of time. It seems to us that the conclusion is inescapable that *287 the property actually purchased by the petitioner was the property in its condition at the time of delivery, i.e., the property in good operating condition and in as good condition as the same now is [June 8, 1920], "* * * excepting ordinary wear and tear and decay." [Italics ours]. Hence, since the petitioner contracted to buy the property in its condition as of January 1, 1921, or in as good operating condition as of June 8, 1920, minus or excepting wear, tear, and decay, it cannot be said that the property purchased was subject to any depreciation which would have to be borne by the petitioner during the period between June 8, 1920, and January 1, 1921, or that its investment was being reduced, since its investment represented the property as of January 1, 1921. As to the condition of the property now under consideration, the petitioner bought it in its depreciated condition as of January 1, 1921. Therefore, it did not experience, suffer or sustain any depreciation of the property before that date. As a matter of pure fact it had no depreciation on the property in 1920 and hence it cannot deduct any depreciation of the property for that year. [See Fox River Paper Co., supra, at 1203-1204.] *288 The instant facts lend themselves to an analysis similar to that in Fox River Paper Co., supra. The terms of the real estate contract clearly indicate the bargaining process which transpired between petitioner and National City and which resulted in substantial financial advantages to petitioner and his co-purchasers. Petitioner and his co-purchasers not only were able to negotiate the Trolley Square property purchase price down from $675,000 to $610,000 but they were also able to realize an additional cash savings of approximately $30,000 in the process. The cash savings resulted from the fact that the dollar amount that petitioner and his co-purchasers saved by not having to pay real estate property taxes, insurance premiums and interest on the remaining purchase price balance exceeded by some $30,000 the amount that they would have received if the rental payments from the Salt Lake City Lines lease had been included in their gross income. In order to secure the above-delineated benefits, petitioner and his co-purchasers compromised pursuant to the real estate contract (1) that National City would retain the right to receive the monthly rental payments from the *289 Trolley Square property, and (2) that, upon Salt Lake City Lines' vacating of the Trolley Square property, petitioner and his co-purchasers would accept delivery of the property in the same condition it was in as of June 26, 1969, with the exception of normal wear and tear incurred by the property during the time period from June 26, 1969, through the date of Salt Lake City Lines' vacating of such property. The financial benefits realized by petitioner and his co-purchasers pursuant to the terms of the real estate contract were not the product of either inadvertent or poorly-conceived planning; to the contrary, they were produced by shrewd, calculated bargaining on the part of petitioner and his co-purchasers. Accordingly, we have concluded that the unrebutted strong inference of the facts in the instant record is that petitioner and his co-purchasers consciously intended to purchase the Trolley Square property in its depreciated condition as of August 31, 1970 (i.e., the date of the projected expiration of the Salt Lake City Lines lease). Therefore, we hold that petitioner did not sustain any economic loss from the depreciation of the Trolley Square Property during the time period *290 from June 26, 1969, through August 31, 1970, and that petitioner, thus, is not properly entitled to a depreciation deduction with respect to the Trolley Square property for this time period. See Fox River Paper Co., supra.[3]
*291 The second issue pertains to whether petitioner was entitled to a depreciation deduction with respect to the Trolley Square property for the time period from September 1, 1970, through December 31, 1970. Respondent contends that the Trolley Square property was neither used in a trade or business nor held for the production of income during the time period from September 1, 1970, through December 31, 1970, and that petitioner is, thus, not entitled to a section 167(a) depreciation deduction for this time period. [4] We disagree. After carefully analyzing the relevant facts in the record, we have concluded that petitioner and his partners held the Trolley Square property for the production of income throughout the last four months of 1970. Petitioner and his co-purchasers acquired the Trolley Square property in 1969 because of its substantial economic potential. They perceived at that time that the property could be utilized in a number of economic ventures ranging from a cash and carry grocery outlet to a shopping center complex. Moreover, petitioner and his partners commenced early in 1970 to remodel and repair the Trolley Square property, and continued the remodelling and *292 repair process throughout all of 1970. This fact suggests that petitioner and his partners anticipated that even if the Salt Lake City Lines lease was not renewed, the partial modernization of the Trolley Square property could only enhance its desirability to other prospective tenants. Finally, a portion of the Trolley Square property was leased in November 1970 for usage as a gas and service station. These facts, when examined in connection with the remainder of the record, have persuaded this Court that petitioner acquired the Trolley Square property in June 1969 because of its income-producing potential, and that he and his partners continued to hold this property for the production of income during 1970 and specifically throughout the last four months of 1970. *293 We recognize that, aside from any rental income produced by the Salt Lake City Lines lease during September 1970, no other income was produced by the Trolley Square property during the last four months of 1970. We are of the opinion, however, that the lack of productivity is not determinative as to the issue of whether property is held for the production of income for depreciation-allowability purposes. As this Court stated in Frank A. Newcombe, 54 T.C. 1298, 1303 (1970), "[the] key question, in cases of the type involved herein, is the purpose or intention of the taxpayer in light of all the facts and circumstances." [citation omitted]. Under the facts and circumstances of the instant case, we have found and so hold, that petitioner's partnership did hold the Trolley Square property for the production of income throughout the last four months of 1970, and that petitioner is, thus, properly entitled to a depreciation deduction for this property for the September 1, 1970, through December 31, 1970, time period. [5]
*294 Decision will be entered under Rule 155. Footnotes
1. By delaying payment of any interest on the remaining balance of the Trolley Square property purchase price until the expiration of the Salt Lake City Lines lease, petitioner estimated that an approximate savings of $30,000 was realized. ↩
2. The other adjustments contained in the notice of deficiency were either not contested by petitioners or were settled by the parties during the trial. ↩
3. We note that an additional argument justifying our conclusion is that the evidence in the record strongly infers that petitioner and his co-purchasers did not acquire "ownership" of the Trolley Square property until September 1, 1970. The warranty deed executed by National City on November 24, 1969, with respect to the Trolley Square property was placed in escrow contingent upon payment of the purchase price specified in the June 26, 1969, real estate contract. We recognize that in particular circumstances "ownership" may be transferred even though legal title is placed in escrow as a security device. However, such "ownership" requires both the buyer's possession of the property and the buyer's assumption of the benefits and burdens inherent in ownership of property. In the instant case, petitioner and his co-purchasers neither acquired possession of, nor assumed the benefits and burdens of ownership with respect to, the Trolley Square property until September 1, 1970. Cf. Gordon J. Harmston, 61 T.C. (Nov. 14, 1973). We further note that our conclusion with respect to petitioner should not be construed as affecting the potential question of whether National City had a depreciable economic interest for the period from June 26, 1969, through August 31, 1970. ↩
4. Section 167(a) of the Internal Revenue Code of 1954 provides as follows: SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
5. Due to our holding that the Trolley Square property was held by petitioner and his partners for the production of income during the last four months of 1970, we are not required to determine whether such property was used in a trade or business during this time period. ↩