Edward G. LOWRY, Jr., and
Ruth D. Lowry

v.

UNITED STATES of America.

Civ. A. No. 73–285.

United States District Court,
D. New Hampshire.

Nov. 1, 1974.

Edward G. Lowry, Jr., pro se.

Daniel J. Dinan, Tax Div., Dept. of Justice, Washington D. C., William J. Deachman, U. S. Atty., for the District of New Hampshire, Concord, N. H., for defendant.

## OPINION

BOWNES, District Judge.

Plaintiffs bring this action to recover federal income taxes and interest, in the amount of $1,072, which they allege were erroneously or illegally assessed and collected. Jurisdiction is based on 28 U.S.C. § 1346(a)(1).

The issue is whether plaintiffs, who ceased to use their summer house as residential property in 1967 and immediately offered it for sale without attempting to rent the property, converted it into "income producing property," thereby entitling them to deduct the maintenance expenses incurred after it was put on the market and prior to its sale in 1973. The Internal Revenue Service allowed plaintiffs to take maintenance deductions in the tax years 1968 and 1969. They disallowed similar maintenance deductions in the tax year 1970. The only year in issue is 1970.[1]

Plaintiffs are husband and wife domiciled in Peterborough, New Hampshire. (Since Edward G. Lowry, Jr., is the principal party in this case, he alone will hereinafter be referred to as plaintiff.) Plaintiff filed a joint federal income tax return for 1970 with the District Director of Internal Revenue in Portsmouth, New Hampshire. On his 1970 income tax return, plaintiff deducted expenditures made for the care and maintenance of his former summer residence. He based these deductions upon the premise that the summer residence was no longer personal property, but was property "held for the production of income." Int. Rev.Code of 1954 § 212. The Internal Revenue Service disagreed with plaintiff and disallowed the deduction basing its decision on Internal Revenue Code of 1954 § 262 which provides:

Except as otherwise expressly provided in this chapter, no deductions shall be allowed for personal, living, or family expenses.

---

1. Plaintiff, due to his own mistake, failed to take the allowable depreciation deductions and that matter is not before this court.

On November 27, 1971, plaintiff paid the disputed $1,072 under written protest.

The property in question is plaintiff's former summer residence on Martha's Vineyard (hereinafter referred to as Vineyard property). The Vineyard property is part of a cooperative community known as Seven Gates Farm Corporation.

Seven Gates was formed in 1921 by five persons, one of whom was plaintiff's father. Upon forming the corporation, plaintiff's father acquired the Vineyard property. In 1942, plaintiff acquired "title" to the property by gift from his father.

Legal title to the Vineyard property is held by Seven Gates. In 1970, plaintiff had a lease for the Vineyard property and was a 3% stockholder in the corporation. The leasing arrangement treated plaintiff as the de facto owner of the property. It ran for the life of the corporation with the proviso that, upon dissolution of the corporation, it would automatically be converted into a fee title. No stockholder-lessee, however, could sell his stock and lease without the prior consent of 75% of the stockholder-lessees. Each lease further provided that a rental for a year or less required the prior consent of the Committee on Admissions and that a lease for more than a year required the prior consent of 75% of the other stockholder-lessees.

In 1966, plaintiff owned three residential properties: he maintained his legal residence in Maryland; he had a winter residence in Florida; and the Vineyard property. During 1966, plaintiff sold his Maryland home and purchased a house in Peterborough, New Hampshire. Because the Peterborough house did "all the things that the house in Martha's Vineyard did," plaintiff decided, in 1967, to sell the Vineyard property and put a sales price on it of $150,000. From 1921 through 1967, plaintiff had spent nearly all of his summers at the Vineyard property.

After it was put on the market, the house was never again used as residential property. Each spring plaintiff went to Martha's Vineyard, opened the house, put up curtains, pruned the shrubbery, generally cleaned and spruced up the property, and then left. This took two or three days and plaintiff occupied the house during this period. Each fall plaintiff returned and closed the house for the winter. The closing also took two to three days and plaintiff stayed in the house. The only other time that plaintiff occupied the property was once a year, when the corporation had its annual meeting of stockholders. As evidence of his intent to treat the Vineyard property as a business asset, plaintiff testified that in 1971 his daughter, after returning from abroad, requested the use of the property. Plaintiff refused, stating that the property was a business proposition. As a fatherly gesture, however, he rented a summer home in Maine for her use.

Plaintiff made no attempt to rent the house for the following reasons: He believed that it would be easier to sell a clean empty house than one occupied by tenants; the house being suitable for summer occupancy only, would have had to have been rented completely equipped, which would have required the plaintiff to purchase linen, silver, blankets, and recreational equipment at a cost which would not have been justified by any possible rental; rental prices bore no reasonable relation to the value of the property and the expected sales price; and rental was complicated by the restrictive provisions of the corporation's bylaws.

In 1968, a prospective purchaser offered to buy the property for $150,000. Plaintiff, however, could not obtain the necessary 75% approval of the stockholders of Seven Gates and the sale was not completed. In 1973, plaintiff received a cash offer of $150,000 for the property and the sale was closed in September of 1973. Plaintiff's 1973 tax return showed a net long-term capital gain of $100,536.50, as a result of the sale.

## RULINGS OF LAW

The tax issue in this case is: When and how does residential property become converted into income producing property?

The Tax Court, in attempting to establish a clear guideline in a murky area, created a simple test: The taxpayer had to make a bona fide offer to rent in order to convert residential property into "income producing property."[2] The Tax Court's *sine qua non* was a product of administrative reality. There are three basic reasons why the Government established a rental prerequisite. First, it stemmed from a fear that taxpayers would countermand the listing for sale after taking a series of deductions and reoccupy the house on a personal basis. Mary Laughlin Robinson, 2 T.C. 305, 309 (1943). Second, the rental requisite provided a clear and convenient administrative test. Warren Leslie, Sr., 6 T.C. 488, 494 (1946). Third, the rental requirement found some implied support in Treas.Reg. § 1.212–1(h) (1954), which provides:

> Ordinary and necessary expenses paid or incurred in connection with the management, conservation, or maintenance of property held for use as a residence by the taxpayer are not deductible. However, ordinary and necessary expenses paid or incurred in connection with the management, conservation, or maintenance of property held by the taxpayer as rental property are deductible even though such property was formerly held by the taxpayer for use as a home.[3]

In Hulet P. Smith, 26 T.C.M. 149 (1967), aff'd 397 F.2d 804 (9th Cir. 1968), the Tax Court abandoned the rental test and held that an offer for sale plus an abandonment transformed the property into an investment asset. The Court of Appeals, in affirming, circumspectly stated:

> The Government makes a strong case for reversal. See Recent Development, Hulet P. Smith, 66 Mich.L.Rev. 562 (1968). Unusual circumstances are present, however, and we are not persuaded that the Tax Court's factual finding and its consequent conclusions are clearly wrong.[4] Smith, supra, 397 F.2d 804.

In a subsequent decision, the Tax Court was presented with a fact pattern which was similar to the one presented in. *Smith* and came to the opposite conclusion. Frank A. Newcombe, 54 T.C. 1298 (1970). The court stated that *Smith* was "of little precedential value." *Id.* at 1303.

In *Newcombe* the taxpayers moved out of their personal residence and immediately offered it for sale. At no time was the property offered for rent. The taxpayers argued that, under the *Smith* doctrine, the property was being held for the production of income. The Government contended that the *Smith* case was erroneous and that property can only be converted into income producing property use when there has been a bona fide offer to rent.

■■ In rejecting both parties' positions, the court stated:

> We do not share the penchant for polarization which the arguments of the parties reflect. Rather, we believe that a variety of factors must be weighed. . . . Newcombe, supra, 54 T.C. at 1299–1300.

The *Newcombe* court found that "[t]he key question, in cases of the type involved herein, is the purpose or intention of the taxpayer in light of all the

---

2. *See* Note, Recent Developments, Hulet P. Smith, 66 Mich.L.Rev. 562, 564–65 n. 14 (1968), and numerous cases cited therein.

3. *Id.* at 566 where "[b]y implication, then the regulations require a rental offer to convert a former residence to income producing property."

4. It is unclear as to what "unusual circumstances" the Court of Appeals was referring to. *See* Note, 25 Tax L.Rev. 269, 272 (1970) :

> [O]ne would especially like to know what "unusual circumstances" the appellate court thought were present, since this does not appear to be such a situation.

facts and circumstances." *Id.* at 1303. The critical inquiry is, therefore, whether the taxpayer had or intended an "expectation of profit." To aid in its inquiry, the court took into account the following considerations: length of time the taxpayer occupied his former residence prior to abandonment; the availability of the house for the taxpayer's personal use while it was unoccupied; the recreational character of the property; attempts to rent the property; and, whether the offer to sell was an attempt to realize post-conversion appreciation. The court explained its final criterion as follows:

> The placing of property on the market for immediate sale, at or shortly after the time of its abandonment as a residence, will ordinarily be strong evidence that a taxpayer is not holding the property for post conversion appreciation in value. Under such circumstances, only a most exceptional situation will permit a finding that the statutory requirement has been satisfied. *On the other hand, if a taxpayer believes that the value of the property may appreciate and decides to hold it for some period in order to realize upon such anticipated appreciation, as well as an excess over his investment, it can be said that the property is being "held for the production of income." Id.* at 1302–1303 (emphasis added).

I rule that the Vineyard property was converted into income producing property in 1967 and that plaintiff was entitled to deduct his maintenance expenses. In ruling in plaintiff's favor, I adopt the approach taken by the *Newcombe* court and do not regard renting as the "litmus test" for conversion.[5]

Administrative difficulty in determining when personal property is transformed into investment property should not create a rigid and inflexible barrier to the benefits of conversion.[6] Plaintiff gave sound and substantial business reasons for his failure to rent. I also note that the rental rule does not provide an elixir to administrative ills, for it must be determined that the offer to rent is bona fide and not a sham. Paul H. Stutz, 1965 P–H Tax Ct.Mem. ¶ 65,166; S. Wise, 1945 P–H Tax Ct. Mem. ¶45,298. Finally, I do not believe that Treas.Reg. § 1.212–1(h) (1954) commands a rental offer as a prerequisite to converting a prior residence into income producing property. I find the language contained therein, with regard to renting, to be illustrative and not an explicit statement of law.

In fact, another regulation provides that: "[t]he term 'income' for the purpose of section 212 . . . is not confined to recurring income but applies as well to gains from the disposition of property." Treas.Reg. § 1.212–1(b) (1954). The regulation further provides that the maintenance expenses of property held for investment are deductible; even if the property is not producing income, there is no likelihood of current income, and there is no likelihood of gain upon the sale of the property.

The determination of whether plaintiff's prior residence has been converted into income producing property is made by examining the taxpayer's purpose in light of all the facts and circumstances. Treas.Reg. § 1.212–1(c) (1954). I find that the facts and circumstances presented clearly indicate that plaintiff intended to benefit from post-abandonment appreciation.

I take judicial notice that the price for recreational property on Martha's Vineyard and everywhere else in New England has skyrocketted in the past decade. Plaintiff has had wide exposure to financial and real estate transactions. He was thoroughly exposed to the real estate world from 1934 to 1943. During

5. I. J. Wagner, 33 T.C.M. 201 (February 19, 1974); Charles D. Mayes, 30 T.C.M. 363 (April 28, 1973); Raymond L. Opper, 31 T. C.M. 48 (May 25, 1972); Richard R. Riss, Sr., 56 T.C. 388 (May 24, 1971); Richard N. Newbre, 30 T.C.M. 705 (July 15, 1971); James J. Sherlock, 31 T.C.M. 383 (April 27, 1971).

6. *See* note 2, *supra* at 568.

that period, he liquidated about 15,000 properties in about 1,200 communities located in thirty-six states. He was specifically aware of Martha's Vineyard land values, having spent nearly all of his summers there. Plaintiff also testified that he was aware, during the latter half of the 1960's of changing economic conditions. As administrator of a large New York insurance company, he saw increasing cash flow and rising prosperity. He testified that, as a result of this exposure, he came to the conclusion, during the latter part of 1967, that we were in the beginning of an inflationary trend and that the value of land would appreciate markedly. Although the 1967 market value of the Vineyard property was $50,000, plaintiff's business acumen and experience suggested that he could obtain his list price of $150,000 if he kept the property visible and in good condition and waited for the anticipated real estate boom coupled with the anticipated inflation. After a period of five and one-half years, plaintiff did, in fact, sell the property in September of 1973, for his original list price. A capital gain of $100,536.50 appeared on his 1973 income tax return as a consequence of the sale.

The fact that plaintiff immediately listed the property does not negate his contention that he intended to capitalize on post-abandonment appreciation in land values. By an immediate listing, plaintiff made the property a visible commodity on a demanding market. He patiently waited until the economic forces pushed the market value of his property up to his list price.

Based on all the facts and circumstances, I find that plaintiff had a reasonable "expectation of profit" and that the Vineyard property was held as income producing property during 1967. Accordingly, I rule that plaintiff was entitled to deduct the property's maintenance expenses incurred during 1970.

Judgment for the plaintiffs.

So ordered.